**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 16 2014, 1:02 pm

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN JACOB WARRUM**
Mount Vernon**,** Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**LARRY D. ALLEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ORLEY D. YARBER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 65A01-1310-CR-433 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE POSEY CIRCUIT COURT
The Honorable James M. Redwine, Judge
Cause No. 65C01-1209-FB-421

**December 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a jury trial, Orley D. Yarber was convicted of rape[1] as a Class B felony and incest[2] as a Class C felony, and was adjudicated to be a habitual offender.[3] Appealing his convictions, Yarber argues that several statements made by the State during trial constituted prosecutorial misconduct that rose to the level of fundamental error, warranting reversal of his convictions. The State cross-appeals, arguing that the trial court erred in entering Yarber's habitual offender enhancement as a separate sentence.

We affirm in part and remand with instructions to correct Yarber's sentence.

### FACTS AND PROCEDURAL HISTORY

In 2012, Yarber's primary residence was in Illinois. However, Yarber also owned a home in a rural part of Posey County, Indiana, which he visited occasionally to repair damage caused by a flood. That summer, Yarber's thirty-four-year-old niece, J.P., was staying in Posey County with her friend Jim, who owned a home near Yarber's property. Around 8:30 p.m. on June 4, 2012, J.P. was walking along the road when she saw Yarber driving his white Nova. Yarber saw J.P., made a U-turn, and parked in his nearby driveway.

Yarber spoke to J.P., saying, "[C]ome here. I want to talk to you." *Tr.* at 40. Thinking that Yarber wanted to show her damage from the recent flood, J.P. walked onto

---

[1] *See* Ind. Code § 35-42-4-1.

[2] *See* Ind. Code § 35-46-1-3.

[3] *See* Ind. Code § 35-50-2-8. We note that, effective July 1, 2014, new versions of the statutes pertaining to rape, incest, and habitual offenders have been enacted. Because Yarber committed his crimes prior to July 1, 2014, we apply the statutes in effect at the time he committed his crimes.

Yarber's property. Yarber "said he had some meth" and asked J.P. if she wanted a beer, J.P. declined Yarber's offer. *Id*. at 41. Out of the blue, Yarber grabbed J.P. hard by the hair. J.P. screamed, but no one could hear her. Yarber, still holding J.P.'s hair so she could not escape, pulled J.P.'s pants down and, at the same time, used force to bend her over a plastic barrel that had a piece of wood on it. Still standing behind J.P. and holding her hair, Yarber penetrated J.P.'s vagina with his penis. Once Yarber stopped, J.P. pulled up her pants and ran into a nearby cornfield until she saw Yarber drive away.

J.P. returned to Jim's home and immediately called 911. Deputy Andy Porath of the Posey County Sheriff's Office responded to the call and, upon arriving at the scene, was told by J.P. that she had been raped by her uncle, Yarber. Deputy Porath called in for assistance, and Detective Alan Sherretz arrived at the scene soon thereafter. A third officer transported J.P. to the hospital where she was examined by a sexual assault nurse, Shawn Brown. Brown administered J.P.'s rape kit and collected her clothing. Brown also noted a fresh bruise just below J.P.'s hip, which was consistent with J.P.'s claim that Yarber pushed her against a piece of wood on a barrel. That same night, Detective Sherretz went to the hospital, met with J.P. and Brown, and transported J.P.'s clothing and rape kit to the Indiana State Police Laboratory.

Yarber was charged on June 4, 2012, with Class B felony rape and Class C felony incest;[4] at that time Yarber's whereabouts were unknown. On June 21, 2012, Yarber appeared at the Sheriff's Office, voluntarily waived his Miranda rights, and gave a video-

---

[4] Yarber's charging information is not included in the record before us. Therefore, we have determined the date and content of the information by looking at the CCS and the final jury instructions. *Appellant's App.* at 1; *Tr.* at 201.

3

recorded interview to Detective Sherretz. Yarber began his interview by confirming that he was at his Posey County home on June 4, 2012, but denied having raped J.P. Later in that same interview, Yarber denied that he was in Indiana that night; instead, he claimed he was at his Illinois home. More than four months prior to trial, Yarber filed a notice of alibi to that effect.

During trial, Yarber's family confirmed that Yarber's sole route back and forth between his two homes was by way of the Wabash Valley Toll Bridge. Electronic and photographic records were kept of every vehicle that crossed the Wabash Valley Toll Bridge. Contrary to Yarber's claim that he was in Illinois on the night of June 4, Larry Delpha, an accountant with the Finance Division of the Indiana Department of Transportation, testified that, according to toll bridge records, Yarber had crossed the Wabash Valley Toll Bridge, "entering Indiana from Illinois," at 3:14 p.m. on June 4, 2012, and that his car did not return to Illinois until June 6, 2012. *Tr*. at 107-08.

Prior to trial, DNA analyst, Nicole Hoffman, and forensic biologist, Carrie Schmidt, both employees of the Indiana State Police Laboratory, performed testing on matter found in J.P.'s rape kit. *Id*. at 84-90, 94-104. During trial Schmidt submitted a report, which, in pertinent part, stated:

> The DNA obtained from the external genital swabs and from the cutting of the bikini bottoms each demonstrated the presence of a mixture with a major DNA profile. In the absence of an identical twin, Orley Dale Yarber is the source of the major DNA profile to a reasonable degree of scientific certainty.

*State's Ex*. 8 at 43 (evidence numbers deleted from text).

Yarber's alibi defense was presented by his brother, Roger Yarber, and his sister

4

and brother-in-law, Wanda and Larry Thomas. Each witness testified, somewhat inconsistently, that on the night in question, Yarber was in Illinois, had a flat tire, and called the Thomases for help. The Thomases took a spare tire to Yarber, helped him fix the flat, and followed Yarber as he drove to his brother Roger's house. Around 7:00 p.m., the Thomases left Yarber at Roger's house. Roger testified that, while in his home, Yarber showered and watched television, and then left around 10:30 p.m.

The jury convicted Yarber of rape and incest, and Yarber entered a plea of guilty to the habitual offender allegation. The trial court sentenced him to ten years for the rape conviction and a concurrent four years for the incest conviction. The trial court also sentenced Yarber to ten years for his habitual offender finding and ordered that it be served consecutively to his ten-year sentence. Yarber now appeals.

## DISCUSSION AND DECISION

### I Prosecutorial Misconduct

Yarber challenges his convictions, contending that various statements made by the prosecutor during trial constituted prosecutorial misconduct, which placed Yarber in grave peril. Recently, our Supreme Court reiterated our standard of review on appeal. *Ryan v. State*, 9 N.E.3d 663 (Ind. 2014). "In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise." *Id.* at 667. "To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief

is desired, move for a mistrial." *Id*. Here, regardless of whether Yarber contemporaneously objected to the prosecutor's comments, he waived this issue on appeal because he failed to request an admonishment of the jury or move for a mistrial.

Where, as here, a claim of prosecutorial misconduct has been waived, "The defendant must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error." *Id*. at 667-68. "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible." *Id*. at 668. In evaluating the issue of fundamental error, "our task in this case is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such *an undeniable and substantial effect on the jury's decision* that a fair trial was impossible." *Id*. (emphasis in original).

In his brief, Yarber describes various instances of prosecutorial misconduct that he contends, separately or together, constitute fundamental error. Yarber's list of the prosecutor's objectionable comments can be divided into two main claims: (1) statements that Yarber contends effectively "shift the burden of proof" from the State to the defendant; and (2) "personal attacks on defense counsel [that] violated [Yarber's] right to counsel." *Appellant's Br*. at 7. As we explain below, none of the statements identified by Yarber constitutes misconduct, nor does their cumulative effect amount to fundamental error.

6

In opening statement, while discussing DNA evidence, prosecutor Travis Clowers noted, "We take a sample. We compare the samples to what we collect from the victim. [Yarber's] DNA, his semen, in her private area. I don't know what the explanation will be today. I am not sure, if any, he doesn't have a duty . . . ." *Tr*. at 26. Defense counsel, William Gooden, objected, arguing that the prosecutor's comment "suggests that we have to explain something, and we don't." *Id*. The State agreed with defense counsel that Yarber did not have a duty to explain anything, and the trial court sustained Yarber's objection. *Id*. This statement did not shift the burden of proof to Yarber. Clowers made no suggestion that Yarber bore any burden of proof. In fact, Gooden objected right after Clowers said, "[Yarber] doesn't have a duty." *Id*. It was defense counsel who suggested that Yarber had to "explain something." *Id*. We find the State's challenged statement did not constitute prosecutorial misconduct, let alone misconduct that constituted fundamental error.

Yarber next maintains that Clowers shifted the burden of proof when, during closing argument, he said:

> And I think you can see, they don't want the truth out there. They don't want the truth, okay. There is no explanation for that DNA, for that semen. There is no explanation for why the Wabash Valley Toll Bridge Manager comes down and testifies [Yarber] wasn't leaving Illinois day . . . .

*Id*. at 183. Defense counsel objected, stating, "We are under no obligation to prove or explain anything. And he is also impugning my character by claiming that we are trying to hide something and I take offense at that." *Id*. at 184. The trial court overruled the objection. Notwithstanding Yarber's claims to the contrary, the evidence offered by the

7

State allowed the jury to reasonably conclude that Yarber was in Indiana on the night in question and had raped J.P. Clowers's statements did not suggest that Yarber had the duty to speak. Instead, the statement highlighted the fact that Yarber failed to provide the jury with a plausible theory for why Yarber's semen was found on J.P.'s genital area.

Regardless of whether this statement created confusion for the jurors as to burden of proof, that issue was put to rest as Clowers continued with his closing argument.

> These are the facts we have to work with. These are the hard evidence pieces that you guys told me at the very beginning of this trial "that's what we want to hear." "We will take the . . . testimony, we will take those things. But if you have got forensic evidence, if you have got those hard facts that you can't dispute, we want to hear that." Well we have got it. The defense certainly has no burden to prove anything. We have talked about that from the beginning, and myself, Detective Sherretz, who I would thank for a thorough investigation, we get that and that is not a problem. It is our burden. It is our burden. The defense doesn't have anything to prove. But there is no other rational explanation other than [J.P.]'s.

*Id*. at 197. Fulfilling his duty as prosecutor, Clowers presented a persuasive closing argument. *See Ryan*, 9 N.E.3d at 667 ("A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct."). The prosecutor made clear that the State had the burden of proof. Again, this statement did not constitute prosecutorial misconduct, let alone misconduct that constituted fundamental error.

During the remainder of prosecutor Clowers's closing argument, defense counsel Gooden periodically objected to Clowers's statements, contending that they were personal attacks intended to mislead the jury. The most significant exchange between the parties occurred when Clowers suggested that Gooden had called the victim a liar. Gooden

8

objected to this characterization, stating:

> Your Honor, I did not call her a liar, and these personal attacks are absolutely uncalled for in a court of law. And this man should be admonished for making a remark like that. First of all, I never called her a liar. And, secondly, if you are going to make a comment like that is simply [sic] unprofessional and unethical. Come on over here if you want. Are you threatening me?

*Tr*. at 185. Continuing to speak to the jury, Clowers said, "Every time [defense counsel] has these dramatic outbursts, every time he has these dramatic closings, it is to take your focus away from what the facts are." *Id*. Gooden again objected as follows:

> Your Honor, I object. The objection is because of the accusations he is making about me, and now he is trying to claim . . . he is trying to mislead the jury. This man has come in here and done something in forty years I have never seen a Prosecutor do, and impugn the character of the defense attorney who is doing his job.

*Id*. At this point, the trial judge intervened, "Yes gentlemen, let's stick with the evidence in final argument." *Id*.

Here, both the prosecutor and defense counsel strained the limits of civility by engaging in *ad hominem* attacks that did little to advance either their respective cases or promote public confidence in the legal profession. However, none of these exchanges placed Yarber in grave peril. To prevail on appeal, Yarber would have to show that the prosecutor's misconduct constituted fundamental error. *Ryan*, 9 N.E.3d at 668. In light of "all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions" we do not find that "the misconduct had such *an undeniable and substantial effect on the jury's decision* that a fair trial was impossible." *Id*. We affirm Yarber's convictions.

9

## II.     Habitual Offender Sentence

The State cross-appeals contending that the trial court erred when it entered Yarber's habitual offender enhancement as a separate offense. We agree. "It is well settled that an 'habitual offender finding does not constitute a separate crime nor does it result in a separate sentence, rather it results in a sentence enhancement imposed upon the conviction of a subsequent felony.'" *Stephens v. State*, 10 N.E.3d 599, 603 n.5 (Ind. Ct. App. 2014) (quoting *Hendrix v. State,* 759 N.E.2d 1045, 1048 (Ind. 2001)). Here, the trial court sentenced Yarber to ten years in the Indiana Department of Correction for Count I, the rape conviction, and four years for Count II, the incest conviction, and ordered the two sentences to be served concurrently. *Appellant's App.* at 15. The trial court also imposed a habitual offender enhancement of ten years as a separate sentence to run consecutively to the concurrent sentences for Counts I and II. *Id*. Here, the habitual offender adjudication should have been ordered as an enhancement to the rape conviction. Accordingly, we remand to the trial court with instructions to correct, as necessary, the sentencing order, abstract of judgment, and chronological case summary to reflect that the ten-year habitual offender enhancement serves to enhance Yarber's Class B felony rape conviction.

Affirmed in part and remanded with instructions.

BAKER, J., and ROBB, J., concur.